# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

**3-09CV2291-K̄**

CIVIL ACTION NO:

GARY STEINBERG,

        Plaintiff,

vs.

BPO MANAGEMENT SERVICES, INC.
F/K/A HEALTHAXIS, INC., JOHN
CARRADINE, RON HERBERT, PATRICK
DOLAN,

        Defendants.

----------------------------------------/

```
U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
      FILED

    DEC - 2 2009

CLERK, U.S. DISTRICT COURT
By _____
              Deputy
```

3:09cv2291-K

---

### COMPLAINT AND DEMAND FOR JURY TRIAL

---

COMES NOW, the PLAINTIFF Gary Steinberg, and files this Complaint against DEFENDANTS

BPO Management Services, Inc. f/k/a Healthaxis, Inc., John Carradine, Ron Herbert and Patrick Dolan and

says as follows:

#### NATURE OF THE ACTION

1. This is a federal action seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") and the common law of the State of Texas.

#### JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections §§ 10(b), 13(a), 14(a) and 20(a) of the Exchange Act, (15 USC 78j(b) and 78t(a)), and Rules 10b-5, 13a-14 and 14a-9 promulgated thereunder (17 CFR 240.10b-5, 17 CFR 240.13a-14 and 17 CFR 240.14a-9).

3. This Court has jurisdiction over this action pursuant to Sections §§ 21(d)(1), 21(d)(2), 21(d)(3)(A), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(l), 78u(d)(2), 78u(d)(3), 78u(e) & 78aa.

4. This Court has personal jurisdiction over all defendants.

5. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate

commerce, of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

6.  Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. 78aa and 28 USC 1391(b), because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district and because the defendants inhabit and/or transact business within this district.

## THE PARTIES

7.  Plaintiff Gary Steinberg is a resident of the State of Florida and a shareholder of Healthaxis.

8.  Defendant BPO Management Services, Inc. f/k/a Healthaxis, Inc. ("Healthaxis" or the "Company") is a corporation organized under the laws of Pennsylvania with significant business operations located at 7301 State Highway 61, Suite 300, Irving, Texas 75039 and is under the control of defendants and the Healthaxis Board of Directors (the "Board").

9.  Defendant John Carradine ("Carradine") was at all times relevant the Company's President, Chief Executive Officer and a Member of the Board up until the consummation of the merger described herein. Carradine is currently the Chief Operating Officer of the Company and is a resident of Texas. Carradine is being sued in his capacity as an officer of Healthaxis and as a director of the Company.

10. Defendant Ron Herbert ("Herbert") was at all times relevant the Company's Chief Financial Officer up until the consummation of the merger described herein. Herbert is presently the Chief Financial Officer of the Company and is a resident of Texas.

11. Patrick Dolan ("Dolan") was the Chairman of the Board and Chief Executive Officer of BPO Management Services, Inc. ("BPOM") until the consummation of the merger described herein and is presently the Chief Executive Officer and Chairman of the Board of Healthaxis. Dolan is being sued in his capacity as Chief Executive Officer and Chairman of the Board of Directors of Healthaxis and for his actions prior to the consummation of the merger.

12. It is appropriate to treat all of the individual corporate officers and board members as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, sworn statements and press releases as alleged herein are the collective actions of this narrowly defined group of defendants.

## THE FRAUDULENT SCHEME

13. BPO Management Services, Inc. ("BPOM") is a corporation organized under the laws of the State of Delaware and has its principal place of business in the State of California.

14. On or about December 30, 2008, BPOM and Healthaxis completed a merger of the two companies ("the merger") whereby Healthaxis issued stock to BPOM shareholders and BPOM became a wholly owned subsidiary of Healthaxis. BPOM still exists as a corporate subsidiary of Healthaxis.

15. Defendants perjured themselves under oath by making false statements of material facts at a hearing before the California Department of Corporations held to provide Healthaxis with an exemption from federal securities laws regarding the issuance of securities attendant to the proposed merger transaction.

16. Defendants issued press releases and SEC filings that contained material misstatements of fact and material omissions for the purpose of deceiving regulators and shareholders for their own material gain.

17. Defendants proffered many of these same tainted press releases and SEC filings to the California Department of Corporations as part of their request for a permit to issue securities without SEC approval.

18. Defendants filed reports with the SEC knowing that the statements contained therein were false and likely to lead to the successful consummation of defendants' fraudulent scheme to enrich themselves to the detriment of their shareholders.

19. The events leading up to and continuing after the consummation of said merger were the direct and proximate results of the defendants' actions and were planned and effectuated in order to perpetrate a fraud on certain shareholders of Healthaxis as described herein (all Healthaxis shareholders, other than defendants, Sharad Tak and Austin Lewis; who were shareholders of Healthaxis prior to the consummation of the merger with BPOM in December 2008, are hereinafter referred to as "certain shareholders") and to enrich defendants. Defendants knowingly made material misstatements of facts and failed to disclose material information in their public statements both before said merger was consummated, and after.

20. Defendants' positions as officers and Board members, along with their access to information not available to the public throughout the pendency of the merger transaction which is the subject of this complaint afforded defendants the knowledge that the misleading misstatements of facts as described herein were false.

21. Defendants' control over the release of information by the Company to the public in respect to the subject matter assured defendants that the California Board, amongst others would have to rely on defendants' statements in order to make decisions relating to the subject merger.

22. Through various devices as described herein, defendants ensured that the only shareholders of the Company that would benefit from their scheme were defendants and certain other parties who aided and abetted defendants in the perpetration of their fraudulent scheme.

23. Defendants falsely and deliberately mischaracterized the merger transaction between BPOM and Healthaxis in order to perpetrate their fraudulent scheme.

24. Defendants failed to disclose material information in order to perpetrate their fraudulent scheme.

25. Defendants created false financial projections in order to perpetrate their fraud.

26. Defendants made material misstatements of facts based on their fraudulent projections in order to perpetrate their fraud.

27. Defendants chose to seek approval from California in order to avoid SEC scrutiny

28. Defendants employed devices deliberately to shield their fraudulent scheme from scrutiny by shareholders and regulators in order to perpetrate their fraud.

29. The Healthaxis Board approved the merger based on defendants' fraudulent representations.

30. Defendants discouraged the solicitation of competing offers for the Company in order to perpetrate their fraud.

31. Defendants made materially misleading representations to Westlake Securities, LLC in order to perpetrate their fraudulent scheme.

32. Defendants made material misstatements of fact and omitted material facts regarding the liquidation preference in order to perpetrate their fraudulent scheme.

33. Defendants disenfranchised its shareholders in order to perpetrate their fraud.

34. Defendants used fraudulent devices to avoid accepting a superior offer to purchase Healthaxis which would have resulted in a significantly higher stock price for all shareholders.

35. Defendant Dolan made material misrepresentations of facts in order to carry out defendants' fraudulent scheme.

36. Defendant Carradine made material misrepresentations of facts in order to carry out defendants' fraudulent scheme.

37. Defendant Herbert made material misrepresentations of facts in order to carry out defendants' fraudulent scheme.

38. Defendants failed to notify Healthaxis shareholders of the loss of approximately 17% of the Company's revenues in order to perpetuate their fraudulent scheme.

39. Not even the regulators would characterize the proposed merger as fair.

40. Defendants had no goal for a merger other than to enrich themselves.

41. Defendants incentivized a shareholder who controlled the actions of a member of the Board of Directors to facilitate the merger in order to perpetuate their fraudulent scheme.

42. Defendants violated various securities laws and common law as described herein as a result of their actions and caused Plaintiff to suffer injury as a direct and proximate result thereof.

**Brief timeline of material events of defendants' fraudulent scheme**

43. On or about June 26, 2007, the Board of Healthaxis held a meeting and decided that it was in the best interests of the Company to sell the Company as the Company was not able to generate meaningful growth on its own.

44. On or about September 18, 2007, the Board hired Larry Schor, a financial advisor with Ansley Capital, to represent the Company in negotiations with parties interested in purchasing the Company.

45. On or about December 19, 2007, Healthaxis released a press release notifying the public, and certain shareholders for the first time that the Company was pursuing a sale.

46. In or about January 2008, Austin Lewis IV met Dolan at an investor conference and solicited Dolan to pursue the purchase of and/or business combination with Healthaxis.

47. On or about February 7, 2008, Dolan emailed Schor to express his interest in Healthaxis. On or about February 18, 2008, Dolan met for the first time with Schor and representatives from Healthaxis.

48. In or about early March 2008, the Healthaxis Board turned down an offer to purchase the company for $9MM in cash and an additional $3MM in business retention payments. Defendants stated that this offer was turned down because it did not offer shareholders long-term potential as the offer was all cash and that it was unlikely they would be able to retain enough business to qualify for the additional payments. This offer would have provided a total of approximately $1.50/share for Healthaxis shareholders.

49. On or about March 7, 2008, BPOM and Healthaxis signed a letter of intent to exclusively negotiate a business combination.

50. On or about September 8, 2008, Healthaxis issued a press release and filed a SEC Form 8K announcing that Healthaxis and BPOM had entered into a definitive merger agreement.

51. On or about September 23, 2008, Ebix, Inc. made the first of several unsolicited bids to purchase Healthaxis.

52. On or about November 25, 2008, defendants attended a hearing in front of an officer of the California Department of Corporations to seek an exemption from registering shares with the SEC to be issued pursuant to the proposed merger.

53. On or about November 28, 2008, defendants issued a proxy statement for shareholders to approve the issuance of new shares, amongst other minor issues.

54. On or about December 29, 2008, Healthaxis held its annual meeting. Shortly thereafter, defendants announced that the merger had been approved by the shareholders (although this was not true as the shareholders were never given the opportunity to vote for or against the merger).

**Defendants falsely and deliberately mischaracterized the merger transaction between BPOM and Healthaxis in order to perpetrate their fraudulent scheme**

55. Defendants made material misstatements of fact that mischaracterized the true nature of the merger transaction.

56. Defendants represented that the merger was a reverse merger whereby Healthaxis would merge with BPOM and Healthaxis would be the surviving entity.

57. Defendants also made public representations in SEC filings that Healthaxis would become "the healthcare division of BPOM."

58. When asked why BPOM wasn't issuing its securities to acquire Healthaxis like it says in defendants' press release, defendants, through their counsel replied "That actually is perhaps not the most accurate description of the transaction."

59. Defendants' response was not only fatuous, but it was a lie intended to deceive a securities regulator as the regulator's question and confusion was a direct and proximate result of defendants' chicanery in attempting to hide their misconduct through the issuance of deceptive and

false press releases and SEC filings.

60. Defendants made these conflicting statements with scienter and created this sham transaction deliberately in order to deceive and confuse regulators and Healthaxis shareholders and enrich themselves in the process.

61. Defendants knew that this transaction was a sham as the surviving entity, although legally (as a result of various devices employed by defendants) the corporation formerly known as Healthaxis, in actuality became an operating subsidiary of BPOM.

62. Defendants falsely claimed that the reason the transaction was structured in this manner was to retain Healthaxis's Nasdaq listing.

63. Although defendants claimed that they would make efforts to retain Healthaxis's Nasdaq listing, no such material efforts were made and the Company withdrew its application to remain listed on the Nasdaq almost immediately after the merger was consummated.

64. Although defendants claim that the surviving entity was the entity formerly known as Healthaxis, the Board of Directors of the surviving entity only had one member from Healthaxis, with the balance of the Board comprised of former BPOM board members.

65. Although defendants claim that the surviving entity was the entity formerly known as Healthaxis, the top officers of the surviving entity were BPOM's former top executives.

66. Although defendants claim that the surviving entity was the entity formerly known as Healthaxis, the name of the surviving entity became BPO Management Services, Inc., which was the name of BPOM prior to the merger and is still the name of both the subsidiary and the parent company today.

67. Although defendants claim that the surviving entity was the entity formerly known as Healthaxis, the former shareholders of BPOM now own 75% of the capital stock of the surviving entity while former Healthaxis shareholders received only 25% of the capital stock of the surviving entity.

68. Although defendants claim that the surviving entity was the entity formerly known as Healthaxis, after the merger was consummated, the corporate headquarters of BPOM remained in California at its prior location, and the corporate headquarters of Healthaxis were moved (at least on paper) to the BPOM location.

69. Although defendants claim that the surviving entity was the entity formerly known as Healthaxis, former shareholders of BPOM received a liquidation preference of approximately $24 MM as a result of the merger while former Healthaxis shareholders received none.

70. Dolan stated, under oath, in response to a question asking why BPOM didn't issue shares to acquire Healthaxis that his goal was to be listed on Nasdaq again to help the value of the company.

71. Dolan then stated that "in effect we're [BPOM] acquiring them [Healthaxis]."

72. Defendants knew, or should have known based on their knowledge and experience and on information and belief the advice of counsel, that the SEC would not approve a merger designed to help defendants perpetrate their fraudulent scheme.

73. Defendants instead sought safe harbor from a State agency which offered almost no relevant review before allowing defendants to effect the transaction.

74. Defendants perpetrated this fraudulent scheme in order to circumvent federal securities laws and regulations designed to protect investors from this sort of malfeasance.

**Defendants failed to disclose material information in order to perpetrate their fraudulent scheme**

75. No disclosure was made, either through press releases or SEC filings, of the Company's intent to sell the Company or merge with another entity for almost six months after management and the Board initiated discussions regarding such and the Board authorized defendants to find an investment bank.

76. During this time when management and the Board omitted to disclose these material events, including turning down several offers to purchase Healthaxis which would have afforded certain Healthaxis shareholders significant and not immaterial financial advantages over what they received as a result of the merger, the market value of Healthaxis continued to plummet.

77. This material omission of facts prevented certain Healthaxis shareholders from maximizing the return they would have realized on the common stock they held to their detriment, and to the benefit of the defendants.

78. In or about December 2007, another company (called "Company A") in the Schedule A, offered to buy Healthaxis for approximately $9 MM, a price that far exceeded what certain Healthaxis shareholders would, and did, receive from the merger. This offer was subsequently raised to $12MM before being declined by defendants a second time.

79. Defendants Carradine and Herbert illegally traded on this information not provided to certain shareholders and purchased Healthaxis stock in the open market to gain financially from their misconduct and insider trading.

80. At the prices of the stock Carradine and Herbert purchased in December 2008, they were guaranteed a profit had the Company accepted Company A's offer. Defendants purchased the stock with inside information not disclosed to the public as no mention of the particulars of these offers was made public prior to the dates Carradine and Herbert made these insider purchases.

81. At no time prior to October 2008 did defendants disclose to certain shareholders that the Board had received an offer from Company A to buy Healthaxis where the purchase price exceeded $1.25 per share for Healthaxis common stock.

82. These material omissions of fact were only made public through the filing of a preliminary proxy statement in October 2008 attendant to the issuance of stock in conjunction with the proposed merger with BPOM.

**Defendants created false financial projections**
**in order to perpetrate their fraud**

83. As early as March 2008, Defendants created financial projections in order to induce others to consent to or aid and abet their fraudulent scheme.

84. Defendants created financial projections that stated that the combined companies would realize

$60MM in revenues in 2009 and $9MM in EBITDA.

85. Defendants knew that these projections could not be realized without significantly diluting the equity of certain Healthaxis shareholders via the acquisition of existing companies which would have to contribute approximately half of the projected revenues and 100% of the EBITDA projections (since neither Healthaxis nor BPOM had positive earnings at the time these projections were made and/or made public and neither company had historical material earnings at any point).

86. Defendants publicly used these projections to fraudulently attempt to convince the California Department of Corporations that the proposed merger was "fair" to Healthaxis shareholders and even went so far as to say they were "confident" these projections would be realized.

87. Defendants hired Westlake Securities to offer a "fairness opinion" as to the proposed merger based in large part on these fraudulent financial projections. In fact, Westlake would not have been able to offer an unqualified fairness opinion without these fraudulent and bogus projections. As a result, Westlake publicly provided this opinion stating the proposed merger would be fair to Healthaxis shareholders when it was not.

**Defendants made material misstatements of facts based on these fraudulent projections
in order to perpetrate their fraud**

88. Defendants were not content to just create fraudulent financial projections to effectuate their scheme and made material false statements based on these fraudulent financial projections.

89. Defendants stated that a "conservative" estimate of the future projected value of the combined companies would be $80MM.

90. This in and of itself is prima facie evidence of a violation of Exchange Act Section 14(a) and Rule 14a-9 thereunder as Westlake stated "Westlake assumed that this information had been reasonably prepared and reflects the best available estimates and judgments of both Healthaxis and BPOMS as to the **future** performance…" [emphasis added]

91. Defendants then stated that it was fair for the Healthaxis security holders to receive 20% of the combined post-merger company based on these projections as this would equate to a pre-merger value of approximately $16.7MM for Healthaxis.

92. Defendants knowingly failed to disclose that this also meant they were implicitly stating that it was fair to allocate approximately $63.3MM to the pre-merger value of BPOM.

93. Defendants knew that BPOM had quarterly revenue of approximately $5.9MM and Healthaxis had quarterly revenue of approximately $3.7 MM at the time they decided that the valuation was fair to Healthaxis shareholders and revenues were declining on a quarterly basis. Healthaxis operations contribute over 50% of the combined revenues of the combined companies in 2009, yet Healthaxis shareholders received only 25% of the equity in the combined entity and no liquidation preference.

94. Defendants knew that both BPOM and Healthaxis had significant operating losses and comparable low cash positions at the time they decided that the valuation was fair to Healthaxis shareholders.

95. Defendants knew it was highly likely that BPOM would run out of cash to run its business within six months at the rate they were burning through their cash and needed to effect a business combination quickly or risk going out of business.

96.  Defendants knew that they could not value the companies based on earnings since neither company had earnings and had significant histories of continued quarterly losses.

97.  Yet, Defendants knowingly effectively claimed the value of Healthaxis was approximately one times revenues and BPOM was approximately 2.5 times revenues in order to perpetuate their scheme and defraud certain Healthaxis investors.

98.  Defendants made these material misstatements of fact and omitted to disclose material facts even after they received a financial analysis from Westlake Securities that used valuation metrics for both companies that included valuing the two companies using measurements from the same business outsourcing companies, effectively stating that the two companies should be valued using the same metrics.

99.  Defendants publicly, and under oath, knowingly stated that the proposed merger was fair to Healthaxis shareholders based on these fraudulent statements and omissions in order to perpetuate their fraudulent scheme.

**Defendants chose to seek approval from California in order to avoid SEC scrutiny**

100.  Instead of seeking approval from the Securities and Exchange Commission (SEC) for the proposed merger, Healthaxis applied to the California Department of Corporations for an exemption from registration of the proposed issuance of securities.

101.  Defendants knew that they were the subject of various SEC complaints when they attended the California Fairness hearing.

102.  Defendants purposefully lied under oath and made material misstatements of fact to the California hearing officer in order to perpetuate their fraud.

103.  Defendants chose to circumvent SEC scrutiny by using the California process. Defendants must be held accountable for their false public disclosures made as a result of their decision.

104.  The public misstatements of fact and omissions of fact which were made by Defendants, under oath, at the California fairness hearing on November 25, 2008 resulted in defendants being able to effect the merger and defraud Healthaxis shareholders.

105.  Had defendants been truthful and not perjured themselves, the merger would not have been effected and Healthaxis shareholders would have received in excess of $1.39/share, per defendants' own valuation analysis.

**Defendants employed devices deliberately to shield their fraudulent scheme
from scrutiny by shareholders and regulators
in order to perpetuate their fraud**

106.  Defendants compelled Tak, Lewis and others to sign non-disclosure agreements so that the terms of their fraudulent scheme would not be made known to certain shareholders and regulators.

107.  Defendants refused to hold any investor conference calls during the entire pendency of the merger negotiations to conceal their fraudulent scheme.

108. Defendants refused to answer all shareholder questions during the pendency of the merger negotiations although they discussed matters relevant to these questions with shareholders Tak, Lewis and Lehman Brothers.

109. Defendants had no legitimate business reason to discuss the merger negotiations with either Lewis or Lehman Brothers other than to get Lewis and Lehman Brothers to sign an irrevocable voting agreement to ensure that they would be able to carry out their fraudulent scheme.

110. Defendants did not disclose the potential sale of the Company with all of its shareholders at the same time or to the same extent.

111. Defendants knew they owed a fiduciary duty to all shareholders to make equally comprehensive and timely public disclosures.

112. Defendants' failure to treat all shareholders equally resulted in a few shareholders receiving more compensation for their shares than other shareholders.

**The Healthaxis Board approved the merger based on defendants' fraudulent representations**

113. The Board stated that it reached its decision to approve the merger with BPOM after consulting with Healthaxis management.

114. Carradine stated that he told the Board he supported the terms of the merger.

115. Carradine participated in negotiations with BPOM regarding the merger terms, including the requirement that he received a lucrative employment contract as a condition to the merger.

116. The Board stated it approved the merger based on the Westlake opinion, which was based on fraudulent financial projections created by defendants.

117. Had defendants not engaged in such fraudulent conduct, the Board would not have approved the merger and Plaintiff would have not have been injured as a result.

**Defendants discouraged the solicitation of competing offers for the Company in order to perpetrate their fraud**

118. Defendants used devices to prevent any business combination of the Company other than that which eventually took place BPOM in the merger.

119. Defendants forced parties, including but not limited to Tak and Lewis to sign non-disclosure agreements to prevent them from soliciting superior offers for Healthaxis. This prevented Healthaxis from receiving offers from other parties that would provide superior financial benefits for certain shareholders.

120. Defendants included termination fees in the merger agreement between BPOM and Healthaxis which discouraged Healthaxis from seeking higher offers from other parties. In fact, once defendants became aware that there was a company offering a higher price to purchase Healthaxis, defendants schemed together to raise the termination fee should Healthaxis accept "a superior offer."

121. Defendants refused to provide parties that were interested in purchasing Healthaxis with the most basic information needed for due diligence.

122. Defendants employed these devices specifically to discourage other parties from offering certain Healthaxis shareholders a higher price for their stock and to further defendants' fraudulent scheme to enrich themselves.

**Defendants made materially misleading representations to Westlake Securities, LLC
in order to perpetrate their fraudulent scheme**

123. On the recommendation of defendants, Healthaxis hired Westlake Securities, LLC to provide a "fairness opinion" in order to deceive regulators and shareholders into believing the terms of the proposed merger were fair to Healthaxis shareholders.

124. Westlake was retained by defendants pursuant to an engagement letter dated June 27, 2008.

125. Defendants gave Westlake pro forma financial projections that could not be achieved by defendants without raising additional capital and buying a company that had significant earnings history and/or potential, further diluting the value of the shares owned by certain Healthaxis shareholders.

126. This material fact was not disclosed to Westlake or to certain Healthaxis shareholders, either privately or publicly.

127. The Westlake analysis was a sham document purchased by Healthaxis management to facilitate their fraudulent scheme and provide cover for their misconduct.

128. Westlake provided an opinion that stated that it was fair to Healthaxis shareholders to receive only 20% of a combined entity pursuant to a merger with BPOM based on valuations that could not be supported by any sound financial analysis based on facts.

129. Westlake provided an opinion to defendants without conducting due diligence as to the veracity of the projections provided to them by Healthaxis.

130. Westlake's opinion valued Healthaxis using comparable valuations of companies that did not reflect either Healthaxis' or BPOM's tenuous financial positions, as well as the two companies' poor track record and inability to generate profits.

131. The Healthaxis Board admittedly approved the merger based in part on this bogus opinion.

**Defendants made material misstatements of fact and omitted material facts regarding the liquidation
preference in order to perpetrate their fraudulent scheme**

132. After the Company received competing bids from Ebix, Inc. to purchase Healthaxis, defendants stated that the Board had secured and approved better terms for Healthaxis shareholders for the merger. They stated that the amended terms meant Healthaxis shareholders would now receive 25% of the combined company vs. 20% previously. Defendants failed to disclose material facts and made these representations to perpetuate the defendant's fraudulent scheme.

133. In fact, the terms of the revised merger agreement were substantially worse for all Healthaxis shareholders. Previously, BPOM shareholders received preferred stock with a liquidation preference of $.84 per share or a total liquidation preference of approximately $19,293,013.92. The revised merger agreement, which was touted by defendants as being "more favorable" for Healthaxis shareholders (than the original agreement) (proxy, pg. 41), provided the BPOM shareholders with a liquidation

559      preference of $1.15 per share or $24,269,547.10.

560

561    134. The increased liquidation preference for the BPOM shareholders effectively reduced the consideration
562         paid to Healthaxis shareholders in the merger by almost $5MM. Moreover, the new agreement
563         increased the termination fee payable by Healthaxis to BPOM $1MM (from $500,000 to $1.5MM) if
564         they accepted a "superior offer." Yet, defendants made these materially misleading statements that this
565         was an enhanced deal for Healthaxis shareholders in an attempt to perpetuate their fraudulent scheme.

566

567    135. As a result of defendants' issuance of false and materially misleading statements, regulators and
568         Healthaxis shareholders were duped into believing that the terms of the merger had become more
569         favorable for Healthaxis shareholders when in fact they became much more onerous for all Healthaxis
570         shareholders.

571

572    136. Defendants however were not injured by these revised merger terms but still stood to gain significantly
573         as a result of their fraudulent scheme.

574

575    137. The Healthaxis Board of Directors represented that the change in these terms was giving them a
576         "greater level of comfort" regarding the value that Healthaxis shareholders would be receiving
577         pursuant to the proposed merger. (pg. 44 of proxy). Clearly, had they been truthful, they would have
578         said "lower level of comfort" instead.

579

580    138. Defendants stated that the merger was in the best interests of Healthaxis shareholders, although
581         they knew this to be untrue.

582

583    139. Carradine stated that the Healthaxis Board of Directors believed that the merger "will generate
584         long-term value for our shareholders."

585

586    140. Defendants admitted in the proxy statement that they rejected other offers to purchase Healthaxis
587         because they offered "no opportunity for equity appreciation for Healthaxis shareholders."

588

589    141. Defendants were aware that structuring the merger whereby a significant liquidation preference
590         was issued would prevent the Company from raising additional capital.

591

592    142. In various public SEC filings and press releases, Defendants stated that they would need to raise
593         additional capital to provide operating liquidity.

594

595    143. Dolan had been unsuccessful in organically growing BPOM since its inception.

596

597    144. Without the infusion of approx. $27MM from institutional investors into BPOM and subsequent
598         acquisitions made with those funds, BPOM would be a company with annual revenues less than
599         $1MM.

600

601    145. Another valuation firm provided a fairness opinion as to the value of the Company to Healthaxis
602         management in 2004. This fairness opinion stated that the existence of a $22.1MM liquidation
603         preference held by the holders of the Company's preferred stock "would prevent the Company from
604         raising additional capital…"

605

606    146. Defendants agreed to merger terms where preferred shareholders would receive a liquidation
607         preference in excess of this amount.

608

609    147. Defendants knew this and ignored this material information to the detriment of certain shareholders in

order to further defendant's scheme.

148. Defendants knew this and failed to state this material fact in its proxy materials in order to perpetuate their fraudulent scheme.

**Defendants disenfranchised its shareholders in order to perpetrate their fraud**

149. Defendants Carradine and Herbert disenfranchised Healthaxis shareholders, to which they owe a fiduciary duty, through their actions and recommendation of the merger.

150. The merger terms provided that the former shareholders of BPOM would effectively control Healthaxis through a preferred stock position which exceeded 50% of the ownership of the surviving entity (net of options and warrants which were granted only to defendants and the former BPOM shareholders).

151. The merger provided that unless the surviving entity could be sold for a price in excess of $24.4 MM (the liquidation preference for the former BPOM shareholders), the common shareholders would receive <u>nothing</u>.

152. This contrasts with Carradine's false and misleading representation that defendants entered into this deal so that the Healthaxis shareholders could realize the "long term potential" of said merger.

153. Carradine and Herbert have a history of taking actions that injured minority shareholders. In 2002, holders of Healthaxis convertible debentures were compensated while the common stock shareholders received nothing.

154. In 2003, UCI was compensated by defendants for its Healthaxis securities at prices far in excess of the market value.

155. In 2004, the preferred stock holders were compensated at 100% of the cost of $4MM of securities they purchased years earlier, while common shareholders received nothing and suffered losses of over 95% of the value of their investments during the same timeframe.

156. Each time, defendants claimed that these transactions were necessary to save Healthaxis from financial ruin yet each time another bailout of these investors took place shortly thereafter.

157. Once again, defendants rewarded those shareholders who were in a position to ensure that Carradine and Herbert could keep their jobs and continue to receive outsized compensation, including unearned bonuses while the common stockholders received nothing.

158. Carradine, as a member of the Board of Directors, owed a fiduciary duty to all shareholders and breached this duty in order to perpetuate defendants' fraudulent scheme.

**Defendants used fraudulent devices to avoid accepting a superior offer to purchase Healthaxis which would have resulted in a significantly higher stock price for all shareholders**

159. Ebix, Inc. ("Ebix") made various offers to purchase Healthaxis starting in September 2008.

160. Defendants used various devices to ensure that no matter how attractive Ebix's offer was for all Healthaxis shareholders, Ebix's offer would not be accepted.

161. Defendants, with the assent of the Board of Directors, made false, deceptive and materially misleading statements in order to cajole three Healthaxis shareholders into voting for the proposed merger and not supporting Ebix's vastly superior competing offer.

162. Carradine stated that it was his belief that the combined companies (Healthaxis and BPOM) could achieve revenue growth, stronger sales, develop cross-selling opportunities and have an ability to approach larger customer prospects to enhance and develop new products and extend their reach in the industry.

163. What Carradine omitted to state was that Ebix is a company with sales almost double that of the combined companies, annual profits exceeding $27MM, a much larger customer base than the combined companies, a strong balance sheet and has year over year revenue and earnings growth.

164. The reasons Carradine gave for the merger, made with the knowledge of the existence of a higher bid from a financially strong and growing company, further evidenced defendants' unwillingness to consider any offer that would benefit certain Healthaxis shareholders to defendants' detriment.

165. The proxy statement (SEC Schedule 14A) of November 28, 2008 stated that the Healthaxis Board of Directors, and its management (of which Carradine was the Healthaxis CEO at all times relevant), rejected an all-cash offer in early 2008 as "inadequate" because the proposal "offered no opportunity for equity appreciation for Healthaxis shareholders."

166. Just nine months later after this offer was rejected, Carradine publicly, through a Company Press Release which reprinted a letter from Carradine to Robin Raina, stated that Healthaxis declined to consider Raina's first two offers as "inadequate" but considered Raina's next offer (which was an all cash offer) to purchase Healthaxis worthy of discussion by the Board of Directors and potentially leading to a "superior offer."

167. Carradine's letter goes on to say that once Raina's all-cash offer was off the table, Healthaxis' Board of Directors concluded that Raina's new stock offer was no longer reasonably likely to lead to a 'superior offer' and declined to even consider it – even though the per share offering price was higher than the all cash offer.

168. Defendants used different criteria to accept or reject different offers to purchase the Company or at least stated such in public filings. Defendants either made material misstatements of fact in the promulgation of these different criteria for different bids or were simply lying about why they accepted or declined various offers. Either way, Defendants violated various securities laws and common law as a result of their actions.

169. Defendants claimed that they negotiated in good faith with Ebix. However, the facts belie this lie.

170. Although defendants stated in the proxy that the Healthaxis Board approved further discussions with Ebix on October 17, 2008, Carradine and Herbert had already signed new employment contracts to ensure their employment with the merger's surviving entity two days earlier. Within four days, defendants signed an amended merger agreement and two days later, defendants delivered a letter to Ebix declining their offer.

171. The false, deceptive and materially misleading statements were made in public SEC filings intended to deceive Healthaxis shareholders into approving the proposed merger with BPOM and not supporting Ebix's vastly superior offer for Healthaxis.

**Defendant Dolan made material misrepresentations of facts
in order to carry out defendants' fraudulent scheme**

172. Patrick Dolan ("Dolan") was the Chief Executive Officer and Chairman of the Board of BPOM up until the date the merger between Healthaxis and BPOM was consummated. Dolan became Chief Executive Officer of Healthaxis and Chairman of the Board of Healthaxis upon consummation of the merger.

173. Dolan made material misstatements of facts intended to mislead Healthaxis shareholders and regulatory officials into believing that the proposed merger between Healthaxis and BPOM was fair and in the best interests of all Healthaxis shareholders.

174. Dolan stated that revenues for the combined companies, should they merge, would be $60 MM in 2009. Dolan stated that earnings (as EBITDA) for the combined companies, should they merge, would be $9MM in 2009. Dolan stated that he was "extremely confident" that these projections would be realized.

175. However, Dolan had no objective basis based on the facts he had at the time for making such outlandish projections and only made them to dupe regulatory officials into giving the companies approval to merge and carry out defendants' fraudulent scheme.

176. Dolan could not even accurately predict what revenues would be within the next 45 days with any accuracy whatsoever. Dolan issued a press release dated November 14, 2008 that stated that he "anticipates" that 2008 revenues for that company would equal approximately $30 million. That press release was issued with approximately 45 days left in the calendar year.

177. BPOM actually had revenues of approx. $28.1 MM in 2008. Dolan's "prediction" for this very short timeframe was off by almost $2MM or about 7%.

178. It is clear that Dolan could not possibly offer any reasonable prediction as to what revenues would be over a year out if he was unable to predict the revenues for the next 45 days. Dolan knew this when he made these outlandish projections but made them anyway to further defendants' fraudulent scheme.

179. Dolan publicly boasted about how he had a track record of making companies profitable. Dolan's actual track record belied this false and misleading statement.

180. Dolan failed to disclose that the price of BPOM stock lost over 98% of its value since December 2006 alone (in less than two years).

181. Dolan failed to disclose that he failed since 2005 to make BPOM profitable or even raise its stock price.

182. Dolan failed to admit that he was the CEO of BPOM when they paid approx. $2.58MM for a company called Docucom in or about June 2007 and sold it just two years later for less than $500,000.

183. Dolan falsely stated that BPOM was a "growth company" at the time he made this statement. Dolan failed to admit that BPOM was on the brink of bankruptcy, had negative net tangible book value, was not paying its vendors in a timely manner, had sequential quarterly drops in revenues, lost money every quarter and had lost customers since 2005.

184. Dolan falsely stated that defendants "did the merger" in order to clean up the capital structure of the

combined company as the capital structure of the combined companies continued to be complex and included an onerous liquidation preference which inured to the benefit solely of BPOM security holders.

185. Dolan falsely stated a reason for the merger was an "improvement in the capital structure, so that more shares are in common." Dolan stated that BPOM's institutional investors would convert their preferred stock to common stock as part of the merger transaction. This did not happen.

186. There are less shares of common stock outstanding of the surviving entity after the merger than there were available for the two companies combined before the merger was consummated.

187. Dolan falsely stated that defendants "upped the offer" for Healthaxis when in fact the revised merger agreement lowered the potential equity for certain Healthaxis shareholders by approximately $5MM and increased the compensation (penalty payable by Healthaxis) to BPOM should Healthaxis receive and accept a better offer.

188. Dolan stated that his vision was to reach $100 MM in revenues for the combined companies by November 2009 and said he believed he could do that. Dolan had no reasonable basis for making such an outlandish public projection based on his and Healthaxis' track record and made this misleading statement in order to further defendants' fraudulent scheme.

189. Dolan falsely stated that BPOM shareholders gave up their liquidation preferences for securities that had "very few preferences" when in truth, BPOM shareholders received a liquidation preference of more than $24MM, which exceeded the market capitalization of the combined companies at the time he made that statement.

190. Dolan falsely stated that the going concern statement made by their auditors for the 2007 fiscal year would not be repeated for the fiscal year ending December 31, 2008 due to the equity raise of approximately $5.1 MM BPOM raised in the first half of 2008. Dolan's knowledge of BPOM's untenable financial position at the time he made this statement reveals the extent of Dolan's duplicity.

191. Dolan failed to state that BPOM had used all of the equity raise prior to the date on which he made this false statement, was forced to borrow additional monies from bank loans and that the Company's financial position was actually worse than what it was at the end of 2007, when BPOM was the subject of a going concern warning from its auditors.

192. Dolan made these false statements and omitted to state material facts in order to perpetuate defendants' fraudulent scheme and dupe Healthaxis shareholders into approving the merger with Healthaxis and State regulators into approving the issuance of shares to BPOM shareholders in order to carry out defendants' fraudulent scheme.

193. Dolan knew his statements were false and outlandish, yet he made them anyway in order to carry out his fraudulent scheme.

194. Dolan made these, and many other false statements under oath, under penalty of perjury, yet he made them anyway in order to perpetrate a fraud for the purpose of enriching himself.

195. To date, Dolan has not recanted these outlandish and materially false statements and Plaintiff continues to be injured as a result of Dolan's actions.

**Defendant Carradine made material misrepresentations of facts
in order to carry out defendants' fraudulent scheme**

196. John Carradine ("Carradine") was the Chief Executive Officer, President and a member of the Board of Directors of Healthaxis up until the date the merger between Healthaxis and BPOM was consummated. Carradine is presently the Chief Operating Officer of Healthaxis.

197. Carradine made material misstatements of facts intended to mislead Healthaxis shareholders and certain regulatory officials into believing that the proposed merger between Healthaxis and BPOM was fair and in the best interests of all Healthaxis shareholders.

198. Carradine stated that the Westlake fairness opinion confirmed the Healthaxis Board's evaluation of the proposed merger. What Carradine failed to state was that Westlake's opinion was based on fraudulent financial information provided to Westlake by defendants.

199. Carradine stated that he believed the proposed merger was fair to both the Healthaxis shareholders and the BPOM shareholders using the rationale that if it was fair to the Healthaxis shareholders, it would also have to be fair to the BPOM shareholders. Carradine made this statement when the terms of the merger transaction allocated approximately 25% of the Company to Healthaxis shareholders and 75% of the Company to BPOM shareholders.

200. Carradine was aware that the prior terms of the merger allocated approx. 20% of the Company's equity to Healthaxis shareholders.

201. Carradine was aware that Westlake previously had issued a fairness opinion stating that the 20% equity stake for Healthaxis shareholders was "fair" for Healthaxis shareholders.

202. It is axiomatic that an allocation of 20% of the Company's equity and 25% of the Company's equity can neither be equal nor can both be fair for the Healthaxis shareholders.

203. Defendants used the Westlake opinions to sway the regulators and induce shareholders to vote for the transactions related to the proposed merger.

204. As Carradine testified under oath that the 25% equity stake for Healthaxis shareholders was fair, the 20% equity stake could not possibly be fair for Healthaxis shareholders. With that knowledge, defendants fraudulently used the Westlake fairness opinion to further perpetrate their scheme.

205. Just about the only truthful statement Carradine made publicly during the pendency of the proposed merger with BPOM was a statement to the effect that Healthaxis shareholders "misunderstand many components of the transaction and/or are misinformed as to our analysis and reasoning in entering into it." That is true because defendants purposefully issued misleading statements of material fact and omitted to disclose material facts to perpetuate their fraudulent scheme.

206. Defendant Dolan admitted under oath that the press releases Carradine issued while President of Healthaxis contained erroneous information and were not accurate.

207. Even the hearings officer for the California Department of Corporations admitted he could not understand what defendants were doing and stated that a layman would have trouble understanding that [defendants' press release].

208. Carradine knowingly made a material misstatement of fact when he stated that BPOM signed a

865        "substantial number of contracts that all come online in the fourth quarter" when in fact they did not as
866        evidenced by BPOM's lower quarterly sequential revenues in the fourth quarter of 2008 and the
867        combined company's lower sequential revenues in 2009.

868

869  209. Carradine knowingly made a material misstatement of fact when he stated that the assets that BPOM
870        possessed were all very good assets. Just six months after the merger, four of the major revenue-
871        producing assets of BPOM were liquidated for pennies on the dollar. As Carradine represented that he
872        conducted due diligence prior to the merger, either Carradine lied when he stated that BPOM's assets
873        were good or he lied about conducting due diligence. Either way, Carradine lied to perpetuate
874        defendants' fraudulent scheme.

875

876  210. When asked by the California hearings officer how two companies with a combined fully-diluted
877        market capitalization of approximately $13MM could suddenly be worth $80MM, Carradine refused
878        to answer the question and instead offered platitudes regarding the "possibilities" of what could
879        happen in the future, along with misrepresentations regarding Dolan's track record. Carradine
880        purposefully omitted to state material facts which would have answered the hearings officer's question
881        and would have led to the denial of the request to exempt the registration of the merger securities from
882        Federal registration requirements.

883

884  211. Through public statements relating to the merger made in the Company's SEC filings, press releases
885        and orally, Defendant Carradine engaged in a systematic and purposeful scheme to defraud certain
886        Healthaxis shareholders in order to enrich himself through continued employment, bonuses and stock
887        options, amongst other illicitly gained compensation. Carradine made numerous untrue statements
888        regarding both the merger and competing offers for the Company. Carradine made these statements
889        with scienter and failed to correct such false and misleading statements once these were brought to his
890        attention through correspondence sent to his attention by Plaintiff.

891

892            **Defendant Herbert made material misrepresentations of facts**
893            **in order to carry out defendants' fraudulent scheme**

894

895  212. Ron Herbert ("Herbert") was the Chief Financial Officer of Healthaxis up until the date the merger
896        between Healthaxis and BPOM was consummated. Herbert is presently the Chief Financial Officer of
897        Healthaxis.

898

899  213. Herbert stated that he relied on the Westlake fairness opinion to calculate the value of Healthaxis stock
900        at $1.39/share.

901

902  214. What Herbert failed to disclose was that the Westlake opinion was based on bogus financial
903        projections provided to Westlake by defendants.

904

905  215. Herbert implicitly admitted that the value of Healthaxis stock that defendants used to perpetuate their
906        fraud could have been any number, depending on what information defendants gave Westlake to come
907        up with their opinion.

908

909  216. As the Chief Financial Officer of Healthaxis, Herbert reviewed, commented on and approved all
910        Forms 8-K, Forms 10-Q and 10-K and proxy statements that Healthaxis filed during all times relevant
911        to this action. Herbert also certified many of these SEC filings.

912

913  217. Herbert made material misstatements of facts as described herein intended to mislead Healthaxis
914        shareholders and certain regulatory officials into believing that the proposed merger between
915        Healthaxis and BPOM was fair and in the best interests of all Healthaxis shareholders.

**Defendants failed to notify Healthaxis shareholders of the loss of approximately 17% of the Company's revenues in order to perpetuate their fraudulent scheme**

218. Healthaxis reported in a Form 8K filing on November 4, 2008 that one of their largest customers has "informally notified us that they intend to move" and admitted that they knew about this since early in 2008. Upon information and belief, this customer accounts for approximately 17% of Healthaxis' total annual revenue. The loss of this customer would result in a significant and material decrease in the financial condition of Healthaxis. The above facts relating to the loss of this significant customer were not disclosed in a timely nor truthful manner as described more fully below.

219. Although defendants knew that a customer representing approximately 17% of Healthaxis' total revenue had noticed the Company in early 2008 that they were intending on canceling their business with Healthaxis and that this loss of business would have a material effect on Healthaxis's revenues, earnings and future prospects, defendants hid this information from shareholders. The absence of full and complete disclosure of this material information materially affected almost every aspect of the proxy and made it misleading and incorrect.

220. In fact, not until Carradine mentioned the loss of this significant customer as a part of a press release dated November 4, 2008 relating to Healthaxis's declination of an offer to buy the Company, defendants hid this material fact from Healthaxis shareholders completely.

221. Defendants did use press releases to communicate with Healthaxis shareholders regarding its business and customers. On September 30, 2008, Healthaxis issued a press release boasting about a minor outsourcing contract it secured with one of its smaller customers.

222. Defendants selectively informed its shareholders about its business as it did not issue any press release regarding the loss of business until Ebix forced the issue by notifying Healthaxis shareholders of this significant loss.

223. Defendant Dolan admitted that he had knowledge of the loss of this customer at the time defendants entered negotiations to merge, which was in the first half of 2008. Dolan admitted in November that the customer had already left although Carradine stated that he had not lost the customer yet, but did not know if Healthaxis had lost any revenue as a result though.

224. However, Healthaxis's quarterly revenue had declined approx. 8% in just six months, from approx. $4.0MM in the quarter ending March 31, 2008 to approx. $3.68 MM in the quarter ending September 30, 2008.

225. Healthaxis was losing business at the time Carradine lied regarding having any knowledge of the loss of the Company's business.

226. Carradine, as the CEO of Healthaxis, would certainly know if the company he was managing had lost revenue from one of its largest customer, but Carradine lied in order to further defendant's fraudulent scheme.

227. In fact, just three weeks earlier, Carradine stated that he has seen "virtually no loss of revenue from this customer" in an effort to discredit the Ebix offer to buy Healthaxis. This statement is obviously materially different than what he stated, under oath, a few weeks later and was uttered in an attempt to defraud Healthaxis shareholders and regulators.

228. Defendants failed to disclose this material fact in required SEC filings and as a result, made false reports as to the financial health and condition of the Company. Defendants Carradine and Herbert certified these SEC filings in violation of Exchange Act Rule 13a-14.

**Not even the regulators would characterize the proposed merger as fair**

229. The attorney for the California Department of Corporations, when asked how the department views the contemplated merger transaction, said only "The department views this transaction as reasonable as it has been presented."

230. The attorney would not and did not say that the department considered the transaction as being fair.

231. The financial analyst for the department did not and would not say the transaction was fair in his analysis and concluded that it only appeared "reasonable."

232. The financial analyst qualified his opinion that the proposed exchange appeared reasonable by prefacing said comment with "Based on the foregoing."

233. The part of his opinion that represented the "foregoing" included false and misleading statements of fact by defendants including, but not limited to: a) that the Westlake fairness opinion provided to the California Department of Corporations was not based on similarly misleading misstatements of fact and violations of SEC regulations regarding the provision of financial projections that were misleading and b) that BPOM had positive EBITDA in their 2008 second quarter earnings report.

234. BPOM's 10Q for the quarterly period ending June 30, 2008 in fact showed that BPOM had negative EBITDA.

235. Defendants deliberately provided false and misleading information to the department in order to perpetuate their fraudulent scheme.

236. The hearing officer characterized the proposed merger as "the fly eating the frog."

237. The hearing officer stated that he believed defendants' statements regarding valuations and market caps were "optimistic." In fact, he characterized them as optimistic not once, but four times in stating his opinion of the proposed merger.

238. The hearing officer said that he would slap [defendants] on the hand for being optimistic and would stop them from being optimistic if there was a law against being optimistic.

239. There are federal laws prohibiting public companies from making optimistic financial projections not based on sound financial analysis and in the absence of any facts that could support making them.

240. There are federal laws prohibiting companies from using false and misleading projections of future market value in proxy statements.

241. Defendants broke these laws by making such baseless projections.

**Defendants had no goal for a merger other than to enrich themselves**

242. Defendants' only goal for effectuating the merger was to enrich themselves.

243. Defendants colluded to ensure that control of the Company would only be ceded to another entity in a transaction where the individual defendants gained financially to the detriment of certain shareholders of the Company.

244. Defendants rejected offers from potential acquirors that would have resulted in superior financial returns for Healthaxis shareholders other than those named as defendants herein, as well as superior disclosed financial returns for all other shareholders.

245. Defendants all benefited financially from the merger with BPOM in December 2008 ("the merger"), while certain shareholders of Healthaxis experienced almost the complete loss of the value of their ownership in the Company.

246. Dolan received an infusion of cash from Healthaxis to keep BPOM solvent, at least for a short period of time. Without the merger, BPOM would have run out of cash and become insolvent.

247. BPOM had a going concern statement to their last audited financial statement and was running out of cash at the time it merged with Healthaxis. In fact, Dolan used $1MM of the cash he received from Healthaxis to pay a BPOM debt that was overdue.

248. Dolan held loans with BPOM and would not be able to be repaid had BPOM gone out of business.

249. Dolan received outsized stock based compensation as a result of the merger, although he continued to manage a business that lost money every quarter and had declining revenues.

250. Carradine and Herbert received lucrative employment contracts, bonuses and stock based compensation for their efforts in completing the merger.

251. Carradine received a $75,000 "signing" bonus when the merger was consummated and Herbert received a $27,500 "signing" bonus.

252. Carradine "earned" another $50,000 bonus and Herbert "earned" another $25,000 bonus shortly after the merger was consummated "related to the integration of the businesses."

253. Carradine received 250,000 free shares of stock and Herbert received 100,000 free shares of stock.

254. Defendants received these rewards for their stewardship of failing businesses which lost money and customers consistently.

255. Larry Schor was paid approximately $750,000 by defendants for his assistance in effectuating a merger of two companies with a combined market cap of not much more than Schor's compensation.

256. Had defendants agreed to negotiate with Ebix or even accept Ebix's superior offer to buy Healthaxis, more likely than not BPOM would have run out of cash and gone bankrupt, Carradine and Herbert would have lost their jobs, Dolan would have lost his job and his ability to collect on the loans he made to BPOM and Tak would not have received a lucrative business contract.

**Defendants incentivized a shareholder who controlled the actions of a member of the Board of Directors to facilitate the merger in order to perpetuate their fraudulent scheme.**

257. Up until the merger was consummated on or about December 30, 2008, Sharad Tak ("Sharad Tak," "Tak" and "Tak Investments" are used interchangeably herein as Tak is the principal of Tak

1069     Investments and upon information and belief is the only shareholder) was the second largest owner of
1070     Healthaxis common stock and Barry Reisig sat on the Board of Directors of Healthaxis.
1071

1072 258. In early 2004, Sharad Tak purchased various securities of Healthaxis, including common stock and
1073     warrants for approximately $5 MM.
1074

1075 259. Healthaxis granted Tak the authority to prevent the Company from selling the Company or entering
1076     into any merger arrangement through an Investor Rights Agreement entered into in 2004.
1077

1078 260. Only through defendants' negligence was Tak able to yield this power in order to prevent Healthaxis
1079     from accepting Ebix's vastly superior bid for the company. Had Healthaxis, through their counsel
1080     Locke, Liddell, not failed to properly register the securities Tak purchased from Healthaxis in a timely
1081     manner, Tak would have lost this power far before defendants had a chance to perpetuate their
1082     fraudulent scheme.
1083

1084 261. Healthaxis granted Tak the authority to appoint a designate to the Board of Directors through that
1085     Investor Rights Agreement. Healthaxis granted Tak the right to be an observer at Board meetings
1086     through that Investor Rights Agreement. Tak appointed Barry Reisig as his designate to the Board of
1087     Directors.
1088

1089 262. Healthaxis entered into a five year outsourcing business agreement with Tak's company as a result of
1090     Tak's purchase of common stock and warrants of the Company.
1091

1092 263. As a result of these transactions, the Board granted Tak the power to prevent Healthaxis from entering
1093     into any purchase or merger deal which would compensate all Healthaxis shareholders equally.
1094

1095 264. Reisig, as a director of the Company, owed a fiduciary duty to all of the Company's shareholders, not
1096     just Tak. Reisig is a certified public accountant, which presumes he has the ability to objectively
1097     evaluate financial data.
1098

1099 265. Reisig, by refusing to perform even the most perfunctory analysis of the numbers used by defendants
1100     to perpetuate their fraudulent scheme and by agreeing to reject a vastly superior offer by Ebix to
1101     purchase the Company breached that fiduciary duty to Healthaxis shareholders. Instead, he voted in
1102     favor of an inferior merger arrangement with BPOM which compensated Tak inappropriately in a
1103     manner which he could be made whole for his investment in the Company while certain shareholders
1104     suffered the loss of over 99% of their investments,.
1105

1106 266. Defendants stated publicly that Reisig was an independent director although they knew that Reisig was
1107     Tak's designate and was not independent. Defendants made this materially misleading statement to
1108     regulators in order to further defendant's fraudulent scheme.
1109

1110 267. Without Tak's authorization, Reisig would not be on the Healthaxis Board. Tak held the power to
1111     appoint Reisig to the Board and to remove him. In all respects, Reisig was Tak's surrogate on the
1112     Board of Directors and was not independent.
1113

1114 268. As Tak's surrogate and subject to removal from the Board at Tak's request, Reisig voted in the
1115     manner Tak instructed him to.
1116

1117 269. In order to further defendant's fraudulent scheme, Tak was granted a seven year extension of a
1118     business contract with the Company with a guaranteed annual minimum (which was a condition of the
1119     merger) while certain shareholders received no such unwarranted largesse.

270. As Reisig's interests and Tak's were aligned, Reisig's approval of the merger and the simultaneous award of a lucrative business contract to Tak are examples of self-dealing by a Board member.

## FIRST CLAIM FOR RELIEF

### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder (against all defendants)**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 270 above.

2. Defendants collectively, and each of them individually, by engaging in the conduct described herein, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

    a. Employed devices, schemes or artifices to defraud;

    b. Made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    c. Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

271. Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Healthaxis stock by disseminating materially false and misleading statements and/or concealing material adverse facts.

272. Defendants made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made not misleading.

273. Defendants acted with scienter as they were made aware of allegations of misconduct as alleged herein by Plaintiff and by the SEC at various times.

274. Defendants acknowledged receipt of notice of the allegations of their misconduct contained in a letter from Plaintiff dated November 2, 2008 in a letter to Plaintiff dated November 20, 2008, stated that they investigated said allegations, and "concluded" that such allegations were without merit.

275. Although defendants were clearly aware of their misconduct and violations of federal securities law and common law, they continued pursuing their fraudulent scheme, further injuring Plaintiff as a result.

276. Either Defendants acted with scienter or defendants' counsel is complicit in the crimes described herein, as the Company's various SEC filings, including the proxy statement, were vetted and/or written by defendants' counsel.

277. Either Defendants acted with scienter or defendants' counsel is complicit in the crimes described herein, as defendants were represented by counsel when they made material misstatements of facts

as alleged herein before the California Department of Corporations.

278. Either Defendants acted with scienter or defendants' counsel is complicit in the crimes described herein, as defendants have stated that they were advised by counsel throughout the negotiation and implementation process involving the merger transaction.

279. Clearly, defendants' counsel did not advise defendants to commit violations of Federal securities laws. Defendants violated these laws and acted with scienter.

280. During all times relevant herein, defendants were privy to non-public information concerning the business, finances, products, markets, and present and future business prospects of the Company. Defendants knew and concealed materially relevant information from certain of the Company's shareholders, including Plaintiff, which caused Plaintiff to suffer injury. At the same time, defendants selectively disclosed non-public relevant information to certain of its shareholders that resulted in injury to Plaintiff.

281. As officers and board members of a publicly held corporation whose common stock was, and is, registered with the Securities and Exchange Commission ("SEC") pursuant to the Exchange Act, and was traded on the Nasdaq Capital Market, and governed by the provisions of the federal securities laws, the individual defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, as well as correct previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common stock would be based upon truthful and accurate information. The individual defendants' misrepresentations and omissions violated these specific requirements and obligations.

282. Each of the defendants, individually and collectively, is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on certain shareholders of Healthaxis by disseminating materially false and misleading statements to and/or concealing material adverse facts from certain Healthaxis shareholders.

283. Additionally, defendants Carradine and Herbert made trades in the stock of Healthaxis based on insider information in an attempt to profit illegally based on this information.

284. By engaging in the conduct described herein, the Defendants violated Section 10(b) of the Exchange Act, 5 U.S.C. 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. 240.10b-5.

285. As a direct and proximate result of defendants' wrongful conduct, Plaintiff has suffered injuries of at least $116,900.

## **SECOND CLAIM FOR RELIEF**

### **VIOLATION OF PROXY SOLICITATION REQUIREMENTS**

#### **Violations of Section 14(a) of the Exchange Act**

#### **and Rule 14a-9 thereunder**

286. Plaintiff realleges and incorporates by reference paragraphs 1 through 285 above.

287. By engaging in the conduct described herein, Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. 78n(a), and Rule 14a-9 thereunder, 17 C.F.R. 240.14a-9.

288. Defendants, by engaging in the conduct described herein, engaged in solicitations by means of a proxy statement, form of proxy, notice of meeting or other communication, written or oral, that contained statements which, at the time and light of the circumstances under which they were made, were false or misleading with respect to material facts, or which omitted to state material facts necessary in order to make the statements therein not false or misleading.

289. Defendants violated proxy solicitation requirements as a result of making material misstatements of fact and omitting to state material facts necessary in order to make the statements therein not false or misleading in proxy materials and other SEC filings, filings with the California Department of Corporations as well as sworn testimony before the Department and press releases issued to the public.

290. Defendants also violated proxy solicitation requirements by making predictions as to specific future market values that were false and misleading.

291. Herbert admitted, under oath, that defendants violated proxy solicitation requirements by stating that the valuation used by defendants to perpetuate their fraud was based on the projections that defendants themselves created

292. These projections had no basis in fact or the histories of either of the companies being merged and were predictions made by defendants to perpetuate their fraudulent scheme.

293. On September 8, 2008, Defendants gave notice of their intent to sell or cause to be sold securities in a public manner in a Form 8-K filed with the Securities and Exchange Commission.

294. On October 23, 2008 and November 28, 2008, Defendants filed proxy statements with the Securities and Exchange Commission relating to the proposed sale of certain securities.

295. The aforementioned proxy statements contained material misstatements of fact and omissions of material facts as described herein.

296. Press releases and various SEC filings issued by defendants relating to the merger also contained material misstatements of fact and omissions of material facts as described herein.

297. Testimony related to the merger given by defendants at a hearing held before the California Department of Corporations, in addition to documents filed with the department, also contained material misstatements of fact and omissions of material facts as described herein.

298. As a direct and proximate result of defendants' wrongful conduct, Plaintiff has suffered injuries of at least $116,900.

### THIRD CLAIM FOR RELIEF

### FOR VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT

#### Against all Individual Defendants

299. Plaintiff realleges and incorporates by reference paragraphs 1 through 298 above.

300. The Individual Defendants acted as controlling persons of the Corporate Defendant within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and /or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

301. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

302. As set forth herein, Company and the Individual Defendants each violated Exchange Act Sections 10(b) and Rule 10b-5 thereunder, 14(a) and Rule 14a-9 thereunder and 13(a) and Rule 13a-14 thereunder by their acts and omissions as alleged in this complaint. By virtue of their positions each as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Plaintiff suffered damages in connection with his ownership of the Company's common stock.

303. As a direct and proximate result of defendants' wrongful conduct, Plaintiff has suffered injuries of at least $116,900.

## FOURTH CLAIM FOR RELIEF

### FOR VIOLATIONS OF CERTIFICATION REQUIREMENTS

#### Violations of Exchange Act Rule 13a-14

#### Against Defendants Carradine and Herbert

304. Plaintiff realleges and incorporates by reference paragraphs 1 through 303 above.

305. The aforementioned proxy statements and SEC filings contained material misstatements of fact and omissions of material facts as described herein

306. Defendants Carradine and Herbert, by engaging in the conduct described herein, and in signing the certifications included with (a) Healthaxis's Form 10-Q for the quarter ending June 30, 2008, (b) Healthaxis's Form 10-Q for the quarter ending September 30, 2008, (c) Healthaxis's Form 10-K for the fiscal year ending December 31, 2007, and (d) Healthaxis's Form 10-Q for the quarter ending March 31, 2008, amongst other SEC filings, falsely certified, among other things, that: (1) the report did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading and (2) the financial statements and other financial information included in the SEC filings fairly presented, in all material respects, the financial condition, results of operations, and cash flows of Healthaxis.

307. By engaging in the conduct described above, Carradine and Herbert violated, and unless restrained and enjoined will continue to violate Exchange Act Rule 13a-14, 17 CFR 240.13a-14.

308. As a direct and proximate result of defendants' wrongful conduct, Plaintiff has suffered injuries of at least $116,900.

## FIFTH CLAIM FOR RELIEF

## FOR BREACH OF FIDUCIARY DUTY

### Against Healthaxis and Carradine

309. Plaintiff realleges and incorporates by reference paragraphs 1 through 308 above.

310. Healthaxis, by and through its Board of Directors, approved the merger of the Company with BPOM.

311. Defendant Carradine was at all times relevant a member of the Healthaxis Board of Directors and owed a fiduciary duty and duty of loyalty to the Company's shareholders, including Plaintiff.

312. Carradine was rewarded financially for his role in the merger with BPOM and his recommendation to the Board to accept BPOM's offer.

313. Carradine received a lucrative employment contract, bonuses and free stock as a condition of the merger.

314. Carradine's self-dealing resulted in the injury Plaintiff incurred as a result of the merger with BPOM.

315. Tak received a lucrative business contract that was a condition to the merger.

316. Tak's designate on the Board, Barry Reisig, knew that he was prohibited by law against self-dealing and owed all Healthaxis shareholders a fiduciary duty and loyalty.

317. Reisig voted for the merger and lucrative contract for Tak anyway, although he knew that Tak was receiving special financial rewards that no other shareholder received.

318. The Board of Directors knew of this self-dealing and still voted to approve the merger.

319. The actions of the Board of Directors breached the duty they owed to Plaintiff and certain shareholders.

320. The Board of Directors knew that the competitive bid from Ebix would have resulted in higher compensation for all Healthaxis shareholders other than defendants and Tak, yet it approved the merger anyway.

321. The Board of Directors knew that defendants were violating securities laws as a result of defendant's fraudulent scheme yet did nothing to stop defendants from carrying out their scheme.

322. The Board of Directors admitted that they reviewed documents accusing defendants of violating securities laws yet they did nothing to protect certain Healthaxis shareholders from being damaged as a

result of defendants' actions.

323. Defendants' breaches of their fiduciary duty to Plaintiff are ongoing.

324. As a direct and proximate result of defendants' breach of fiduciary duty to certain Healthaxis shareholders including Plaintiff, Plaintiff has suffered great financial injury of at least $116,900.

WHEREFORE, Plaintiff respectfully requests that this honorable Court enter a judgment in his favor in an amount that the evidence shall establish, plus interest and costs along with any and all other relief this honorable Court deems equitable and just. Moreover, Plaintiff requests that this honorable Court enjoin defendants from selling the Company, raising capital, entering into any business combination or being the recipients of any additional compensation from the Company pending the outcome of this lawsuit in order to prevent defendants from further enriching themselves. Plaintiff requests that this honorable Court refer defendants to the appropriate regulatory and criminal prosecution agencies of the Federal government. Further, Plaintiff seeks reasonable attorney's fees should Plaintiff retain the services of an attorney during the pendency of this action.

DATED: November 27 2009

GARY STEINBERG
Pro Se
3315 Concert Lane
Margate, Florida 33063
Telephone: (754) 368-6880
Email: healthaxisplaintiff@gmail.com

By: _____
GARY STEINBERG

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Gary Steinberg

*ORIGINAL*

## DEFENDANTS

BPO Management Services, Inc. f/k/a Healthaxis Inc.
John Carradine, Ron Herbert, Patrick Dolan

**(b)** County of Residence of First Listed Plaintiff   Florida
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Dallas, Texas
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

*RECEIVED*
*BY*
**DEC - 2 2009**
*CLERK, U.S. DISTRICT COURT*
*NORTHERN DISTRICT*

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Gary Steinberg, 3315 Concert Lane, Margate, FL 33063
(754) 368-6880

Attorneys (If Known)

3-09CV2291-K

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                   and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☒ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. 78N
Brief description of cause:
Various violations of federal securities law and common law breach of fiduciary duty

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 116,900.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE   11/27/2009

SIGNATURE OF ATTORNEY OF RECORD   *Gary Steinberg, Pro Se*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

POSTAGE REQUIRED.

PLEASE PRESS FIRMLY

Flat Rate
Mailing Envelope

PRIORITY® MAIL

UNITED STATES POSTAL SERVICE

Electronic Rate Approved #03855749

420 75242 9405 5036 9930 0054 5892 84

ZIP - e/ USPS DELIVERY CONFIRMATION™

SHIP TO:
OFFICE OF THE CLERK
U.S. DISTRICT CT
1100 COMMERCE ST
STE 1452
DALLAS TX 75242-1310

9000

GARY STEINBERG
3315 CONCERT LN
MARGATE FL 33063-8217

USPS PRIORITY MAIL®

UNITED STATES POSTAL SERVICE®    Click-N-Ship®

P

Commercial Base Pricing    071V005689911
Mailed from 33309    11/30/09    2 lb 0 oz
Flat Rate Env
US POSTAGE    $4.80
usps.com
9405 5036 9930 0054 5892 84 0048 0002 0087 5242

Any amount
as the envel
entirely conf
provided as

INTERNA

4-POUND
INTERNA

Customs fc
Internation
or ask a ret